**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| HELICOPTER HELMET, LLC, | ) | |
| a Delaware Limited Liability Company, | ) | |
| and GOVERNMENT SURPLUS | ) | |
| SALES, INC.  d/b/a GOVERNMENT | ) | |
| SALES, INC. | ) | |
| a Connecticut Corporation, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:17-cv-00497-LPS |
| | ) | |
| GENTEX CORPORATION, a Delaware | ) | **TRIAL BY JURY DEMANDED** |
| Corporation, FLIGHT SUITS d/b/a | ) | |
| GIBSON & BARNES, a California | ) | |
| Corporation, and JAMES T. WEGGE, | ) | |
| an individual, | ) | |
| | ) | |
|     Defendants. | ) | |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs HELICOPTER HELMET, LLC ("HHC") and GOVERNMENT SURPLUS

SALES, INC. d/b/a GOVERNMENT SALES, INC. ("GS" and, collectively with HHC,

"PLAINTIFFS"), hereby files their Amended Complaint[1] against GENTEX CORPORATION

("GENTEX"), FLIGHT SUITS d/b/a GIBSON & BARNES ("G&B"), and JAMES T. WEGGE

("WEGGE") (hereinafter collectively referred to as "Defendants"), and in support alleges the

following:

## NATURE OF CLAIMS

1.    This is an action for violations of the antitrust laws, deceptive trade practices,

defamation, civil conspiracy, and unjust enrichment.

---

[1] A redline copy of the Amended Complaint is attached hereto as **Exhibit M**.

**PARTIES, JURISDICTION AND VENUE**

2.       HHC is a Delaware limited liability company with its principal place of business in Melbourne, Florida. HHC is engaged in the manufacture and sale of quality helicopter helmets for commercial use and operates a complete Aviation Life Support Equipment ("ALSE") repair facility for all brands of helicopter helmets. None of HHC's members are Delaware residents or citizens.

3.       Gentex is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 324 Main Street, Carbondale, PA. Gentex is a leading manufacturer of flight helmets used by the U.S. Military, government agencies, subcontractors of government agencies, and the commercial market.

4.       G&B is a corporation organized and existing under the laws of the State of California with its headquarters located at 1900 Weld Blvd. Ste 140, El Cajon, CA 92020. G&B is a Gentex dealer and is the exclusive distributor for Gentex helmets for commercial sales throughout the United States, including Delaware.

5.       Wegge is an individual working at 1900 Weld Blvd. Ste 140, El Cajon, CA 92020 and residing in California. Wegge is the Director of G&B.

6.       GS is a corporation organized under the laws of the State of Connecticut, with its headquarters located in Hartford, Connecticut.

7.       GS, Gentex and HHC are direct competitors in the Relevant Market as defined below.

8.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§, 1331, 1332, and 1337(a) and 15 U.S.C. §§ 4 and 15. This action involves protecting trade and commerce against restraints and monopolies, involves parties residing in different

states, and involves claims that exceed the sum or value of $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

9.     This Court has personal jurisdiction over Gentex because Gentex is a corporation incorporated in the State of Delaware.

10.     This Court has personal jurisdiction over G&B and Wegge because, among other things, both: (1) regularly conduct business in the State of Delaware and this judicial district; (2) regularly and systematically direct activities into the State of Delaware and this judicial district with the intent of engaging in business within the State of Delaware; (3) have committed the unlawful acts complained of herein in part, in the State of Delaware and this judicial district, including improperly monopolizing, through fraud, the exclusive sale of helicopter helmets to all Federal and State Agencies in the State of Delaware who purchased helicopter helmets within the past four years, through the present, including, but not limited to, the Delaware State Police, and are expected to continue to do so through the foreseeable future; (4) caused tortious injury to HHC and GS, in part, in the State of Delaware and this judicial district; (5) and otherwise each have sufficient minimal contacts to meet the minimal jurisdictional requirements under the laws of Delaware and the United States, including the marketing and advertising of products in this judicial district, as well as the distribution of products within this judicial district.

11.     G&B and Wegge are subject to the personal jurisdiction of this Court in accordance with the Delaware Long-Arm Statute, 10 *Del. C.* § 3104, and due process.

12.     Venue properly lies within this judicial district pursuant to 28 U.S.C. §1391 and 15 U.S.C. § 22.

## **GENERAL ALLEGATIONS**

13.     The Department of the Interior ("DOI") ALSE Handbook (the "ALSE

Handbook") (attached as **Exhibit A**) regulates all helmets that are purchased for government

agencies including but not limited to the Federal Bureau of Investigation ("FBI"), Drug

Enforcement Agency ("DEA"), U.S. Forestry Service ("USFS"), Bureau of Land Management

("BLM"), the Delaware State Police, and many others.

14.     Helicopter helmets are used by government agencies, contractors performing

work for government agencies, and anyone else required to use a flight helmet under government

funding or supervision must be approved and be listed in the ALSE Handbook. In addition to

government agencies, civilian agencies such as air medical companies, fire departments, state

and local law enforcement, and military contractors rely on this list for selecting flight helmets

for their organizations.

15.     There are currently six OEM helicopter helmet manufacturers in the world that

sell to the U.S. commercial and government market: (1) Gentex; (2) Interactive Safety Products

(acquired by Gentex on July 7, 2014); (3) HHC; (4) Evolution Helmets; (5) GS; and (6) MSA

Gallet ("Gallet") located in France. For many years, Gentex has been the main source for the

flight helmets used by the U.S. Military, and both Gentex and Gallet helmets are on the list of

helmets approved by the DOI in the ALSE Handbook (the "DOI List").[2]

16.     For years, HHC has sought to submit its helmets to the U.S. Department of the

Interior Office of Aviation Safety ("OAS") for approval (or testing and approval) pursuant to the

---

[2]  Helicopter Helmets currently on the DOI List include: SPH-5, HGU-84P, SPH-4B, and HGU-56P manufactured by Gentex; Alpha 200, Alpha 400, Alpha Eagle (900) manufactured by Interactive Safety Products (owned by Gentex); and MSA Gallet LH050, LH150, and LH250. *See* Exhibit A p. 3.

ALSE Handbook or other applicable authority in order to be included on the DOI List.

17.     HHC and GS manufactured helmets have been safety tested at the well-respected Dynamic Research, Inc. Impact Test Laboratory in California. HHC helmets were tested to the safety standards of the helmets used by the U.S. Army as well as the American National Standard Institute ("ANSI") Z90.1b-1979 standard which is used by the OAS. HHC and GS helmets passed both tests with flying colors.

18.     Based on the innovation and modernization of HHC's helmet design (HHC's helmets are less costly and do not have the "cracking problem" widely known to occur with Gentex helmets[3]), prior to April 2013, HHC and GS enjoyed a high level of success in the commercial helicopter helmets market and contracted with and sold thousands of its uniquely innovative helmets to civilian and government agencies and contractors in the State of Delaware, throughout the U.S., and internationally.

19.     In 2013, however, Defendant Wegge, the Director of G&B, started a negative sales campaign against HHC and others by falsely advertising to both Government agencies and the civilian market that HHC's helmets were counterfeit, unsafe, and unapproved. *See* G&B Advertisement 1 attached as **Exhibit C** and G&B Advertisement 2 attached as **Exhibit D**.  At the same time, G&B began using its connections within the DOI and other government agencies in order to discredit HHC and its helmets.

20.     To that end, Wegge began producing a series of "white papers" on the issue of counterfeit parts in commercial helmets (collectively referred to as the "White Papers" or each, individually, as a "White Paper") which focused on the products of Gentex at the time and described the products of its three competitors as "counterfeit" or "nonconforming," meaning

---

[3] *See* Interagency Aviation Safety Alert attached as **Exhibit B**.

non-Gentex.[4]  These White Papers were riddled with false and misleading information about

Gentex's products, helicopter helmets generally, as well as lies designed to promote Gentex

helmets and portray the helmets produced by HHC and other competitors as being "outright

dangerous." For example, the White Paper falsely states that the Gentex SPH-5 has a "Mil Spec"

rating (widely known in the industry to mean that it meets Military Specifications), even though

the SPH-5 has never been designated "Mil Spec" by the U.S. Military as it has never undergone

military testing or been used by the military. *See* Exhibit D p. 5.

      21.     Gentex colluded with G&B by providing false information and data which

Defendants Wegge and G&B used to create the White Papers. Further, Gentex assisted or

approved in its preparations and encouraged, facilitated and participated in their distribution.

      22.     G&B began distributing the White Papers to virtually every helicopter helmet

user in the U.S. and to Government Agencies including the DOI, the Delaware State Police, and

the National Transportation Safety Board ("NTSB") in order to eliminate the demand for non-

Gentex helmets. Additionally, it became G&B's standard practice to disseminate the White

Papers to prospective customers, including at tradeshows, to give them false information about

HHC and GS helmets being unsafe in order to unfairly promote and monopolize market.

      23.     In March 2013, Patrick Jones, an NTSB Investigator, received a copy of one of

the fraudulent White Papers and forwarded it to John Mills ("Mills"), an Air Safety Investigator

of the OAS for the DOI. After being persuaded and misled by the misinformation and lies he

---

[4] The White Papers consisted of: *The Use of Counterfeit Earcups in Commercial SPH Helicopter Helmets*, dated March 1, 2013, updated March 11, 2013, revised April 30, 2013 (attached as **Exhibit E**) (Note: G&B has since retitled this paper: *The Use of Counterfeit Obsolete and Nonconforming Earcups in Commercial SPH Helicopter Helmets*); *The Use of Obsolete and Nonconforming Retentions in Commercial SPH Helicopter Helmets*, dated April 2, 2013, updated April 30, 2013; and *The Use of Obsolete and Nonconforming Shells in Commercial SPH Helicopter Helmets*, dated April 30, 2013

read in the White Paper, Mills reached out to Wegge at G&B and informed him that he wished to write an Interagency (DOI and USFS) Safety Alert based on the White Paper he had received.

24.     Seeing a broader opportunity to attack and discredit the helmets of HHC and GS and its other competitors and to promote Gentex helmets directly through a government agency, Wegge and G&B further promoted the fraudulent and misleading White Paper Mills had already received; forwarded him an additional fraudulent White Paper, and participated in the review and revision of the fraudulent Safety Alert that was produced as a result, and published, on April 30, 2013 (the "AP Bulletin") (attached as **Exhibit F**).

25.     The AP Bulletin addressed three components of helicopter helmets: the earcups, the retention assembly, and the helmet shell.

26.     Through the AP Bulletin, G&B attacked older model Gentex earcups and non-Gentex earcups, including those used by HHC and GS, and included unsubstantiated graphs provided by Gentex to falsely show that non-Gentex earcups are obsolete/unsafe and falsely stated that the retention assemblies used in non-Gentex helmets failed to meet safety standards. *See* Exhibit E, pp. 2-3. Theses false statements which G&B caused to be distributed by the DOI, triggered a run on replacement Gentex parts which were exclusively distributed by G&B and allowed G&B and Gentex to profit in the aftermath of the publication of the AP Bulletin.

27.     Perhaps the most egregious fabrication included in the AP Bulletin was an image of a non-Gentex helmet after an unspecified side impact test. Without stating the results of the test, G&B provided the DOI an image (supplied by Gentex) with a caption stating "Damage to a non-approved helmet from a side impact force". *See* Exhibit E p. 3. What G&B failed to inform the DOI was that the helmet in the image in fact **passed** the impact test required by ALSE standards. This was clearly a scare tactic to influence consumers in order to fraudulently boost

the sales of G&B and Gentex and damage the reputation of products produced by Plaintiffs HHC, GS, and other competitors.

28.     As a result of the AP Bulletin and G&B's other aforestated falsehoods against HHC, GS, and other competitors the BLM awarded G&B a sole source contract for helmets claiming that G&B was the "only responsible source" capable of supplying helicopter helmets. *See* DOI Solicitation Number: L13PS00578, attached as **Exhibit G**. Both Interactive Safety Products (prior to being purchased by Gentex) and HHC submitted timely protests to the Contracting Officer regarding the award, but were ignored. Thus, G&B and Gentex achieved their goal of fraudulently discrediting HHC and GS helmets and promoting those produced by Gentex by providing false information to the DOI.

29.     In a final attempt to destroy HHC, GS, and all of their other competitors, G&B and Gentex caused DOI personnel to draft an update of the ALSE Handbook (the "Draft Handbook") which contains the DOI List, modifying the existing ALSE Handbook to recommend only Gentex helmets,[5] allowing Gentex to dominate the market for supplying flight helmets to the U.S. *See* Draft Interagency ALSE Handbook attached as **Exhibit H**. Under the Draft Handbook, only prior US Military approved helmets would be allowed for use for Government contracts, and G&B and Gentex continued to falsely assert that the Gentex SPH-5 was a "Mil Spec" approved helmet. Government agencies and benefiting G&B as its sole U.S. distributor. Because the DOI List is also used by Non-government organizations, this would be extremely financially beneficial for both G&B and Gentex.

---

[5]  Under the Draft Handbook, only prior US Military approved helmets would be allowed for use for Government contracts, and G&B and Gentex continued to falsely assert that the Gentex SPH-5 was a "Mil Spec" approved helmet.

30.     G&B and Gentex misled DOI personnel by fraudulently providing false information to the DOI and caused the DOI to apply the Draft Handbook in its contracting procedures instead of the approved ALSE Handbook.

31.     Based on a complaint submitted by HHC to the DOI Office of the Inspector General ("OIG") about the Draft Handbook, the OIG conducted an investigation and confirmed the fraudulent and deceptive conduct perpetrated by G&B towards the DOI and BLM.[6]

32.     Based on the findings of the investigation by the OIG, the OAS notified the OIG that it had removed the AP Bulletin which was based on fraudulent and misleading information from its website and would provide a revised version. *See* OAS Response to Management Advisory Investigative Results Memorandum, attached as **Exhibit J**. However, the AP Bulletin still remains available on a number of sites, is continuously republished, and continues to cause damage to HHC and GS.

33.     As a result of the actions G&B and Gentex have taken to drive HHC out of the market, HHC has been forced to close one of its production facilities and restructure the company to mitigate its damages, while decision makers in the relevant market have been duped, manipulated and fraudulently led to make decisions that increase their costs and cause enhanced safety issues for the employees they are responsible for.

34.     Defendants engaged in unfair methods of competition by, among others, submitting to the DOI an image (supplied by Gentex) with a caption stating "Damage to a non-approved helmet from a side impact force". *See* Exhibit E p. 3. This conduct was intended to unlawfully influence expectations of what would happen if a consumer did not wear a Gentex

---

[6] See OIR Report Dated May 8, 2015: *Collusion and Deceptive Vendor Activities toward the Bureau of Land Management,* attached as **Exhibit I**.

helmet in order to fraudulently boost the sales of G&B and Gentex and damage the reputation of products produced by HHC, GS, and other competitors.

35.     Defendants also falsely stated that the Gentex SPH-5 has a "Mil Spec" rating even though the SPH-5 has never been designated "Mil Spec" by the U.S. Military. This unlawful statement creates a likelihood of confusion and/or misunderstanding as to the affiliation, connection or association, as well as certification, of Gentex's products with the U.S. Military and, therefore, is an unfair method of competition.

## THE RELEVANT MARKET

36.     The Relevant Product is Helicopter Helmets.

37.     The Relevant Geographic Area is the United States of America.

38.     The relevant market is the Relevant Products and the Relevant Geographic Area as defined in paragraph 36 and 37 above, which are sold to private individuals and companies, and the Federal Government, and all government entities including local municipalities, counties and States who purchased Helicopter Helmets from May 2013 through the present.

## UNIQUE CHARACTERISTICS OF THE RELEVANT PRODUCT

39.     The relevant product, as defined in paragraph 36 above, enjoys unique market factors which creates the potential for significant monopolizing control by one company to take over the market and cause unfair and deceptive competition. For instance, due to FAA regulations, all helicopter pilots and its crew must have a helicopter helmet. The cost of the helicopter helmet compared to the cost to purchase and maintain a helicopter, is nominal in comparison. So, the roughly $20,000 cost to supply a helicopter crew with helmets is a fraction of one percent as compared to the cost of a helicopter and its maintenance. Therefore, budgets tend to overlook the cost of helmets. Additionally, a helmet, intended to protect one of the most

important pieces of a human body (the head), coupled with safety regulations, causes most market customers to purchase what is perceived to be the best safety helmets money can buy. Indeed, it is hard to quantify the value of safety. This common sense condition of the Relevant Product creates a unique opportunity for an unscrupulous company, such as Gentex, to come in, create and cause the dissemination of false, fake data to unfairly take advantage of the unique characteristics of this Relevant Product.

40.     Entry into the Relevant Market as a manufacturer has significant barriers including millions of dollars in costs to manufacture safe helmets and to market the product.

41.     The technology to manufacture helmets takes many years to develop.

**COUNT I: VIOLATION OF SHERMAN ANTITRUST ACT
(15 U.S.C. § 1 ET SEQ.) AND CLAYTON ACT (15 U.S.C. §12 ET SEQ.)**

42.     Plaintiffs reallege paragraphs 1 through 41 as if fully set-forth herein.

43.     Through the pattern of anticompetitive conduct of Defendants, Defendants have unreasonably restrained trade and conspired to monopolize the relevant markets.

44.     Defendant Gentex has market and monopoly power in the relevant market. Defendant Gentex has monopolized the Government purchases as it controls approximately 99% of the Federal Government purchases, over 90% of the State and Local Government Purchases, and over 80% of the private market.

45.     Defendant G&B and Barnes, as the sole and exclusive distributor of Gentex Helmets in the relevant market, enjoys the same market monopoly power as Gentex as defined in paragraphs 36- 38. Indeed, G&B advertises itself as the sole distributor of Gentex Helmets in the U.S. (See **Exhibit K**).

46.     All defendants caused market-wide anti-competitive effects which caused customers in the relevant market to pay increased prices, caused reduced innovation, and caused customers to overpay for an inferior product in the relevant market.

47.     Defendants caused the anti-competitive effects as explained above.  In brief, Defendants caused the anti-competitive effects by creating and disseminating in the relevant market a false and fraudulent white paper which caused customers in the relevant market to be deceived and to overpay for an inferior or similar product. Gentex provided the false information to Mr. Wegge. Mr. Wegge, utilized his influence of Defendant G&B for G&B to Publish the fraudulent white paper. And G&B used its connections and contacts with federal government officials to induce them to publish false elements of the white papers to be distributed to all customers in the relevant market. Indeed, instead of competing on the merits, Defendants have engaged in a pattern of creating and disseminating false information to prevent and hinder Plaintiffs from being able to sell their products to the relevant market.

48.     In addition to Plaintiffs, all other market competitors in the relevant market, including competitors, Evolution and Gallet, are being significantly affected and harmed. Indeed, the actions of Defendants caused and continues to cause anticompetitive effects, market wide.

49.     In addition to Plaintiffs and the competitors, all customers in the relevant markets are being harmed, are being misled, and are being confused by the unfair practices of all Defendants.

50.     The conduct by Defendants which included the fraudulent creation of white papers with false information was intended to coerce customers to purchase and overpay for an inferior product.

51.     The acts afore-stated by Defendants significantly diminished the other market suppliers' ability to fairly market its goods in the relevant market.

52.     Plaintiffs have invested substantial resources over many years to develop and customize helmets to serve the needs of the relevant market.

53.     Through Defendants' false information and fraud as afore-explained, Defendants have obtained and maintained a dominant position in the relevant markets.

54.     Through Defendants' false information and fraud as afore-explained, Defendants were the only ones that could be awarded government bids in the relevant market.

55.     Through Defendants' false information it disseminated, and its fraud as afore-explained, Defendants have ensured that they would win contracts from U.S. Government entities.

56.     Defendant, Wegge, an individual, is a separate person as defined by the Act, who conspired in perpetuating the frauds afore-explained.

57.     As a direct and proximate result of Defendants wrongful acts, Plaintiffs have sustained actual damages and will continue to accrue and sustain such damages in the future on an ongoing and continuing basis.

## COUNT II: MONOPOLIZATION IN VIOLATION OF 15 U.S.C. § 1 ET SEQ. AND 15 U.S.C. §12 ET SEQ.

58.     Plaintiffs reallege paragraphs 1 through 57 as if fully set-forth herein.

59.     This is an action against Defendants for monopolizing of the relevant markets in the U.S. in violation of the Sherman Antitrust Act and the Clayton Act.

60.     As a direct and proximate result of Defendants' wrongful acts, Plaintiffs have sustained actual damages and will continue to accrue and sustain such damages in the future on an ongoing and continuing basis.

## COUNT III: CONSPIRACY TO MONOPOLIZE IN VIOLATION OF 15 U.S.C. § 1 ET SEQ. AND 15 U.S.C. §12 ET SEQ.

61.     Plaintiffs reallege paragraphs 1 through 60 as if fully set-forth herein.

62.     Defendants have conspired with each other to monopolize the relevant market(s) in violation of the Sherman Antitrust Act and the Clayton Act.

63.     Defendant Wegge acted beyond the scope of his employment with G&B which gives rise to his personal liability.

64.     For purposes of this Act, G&B are separate legal entities incorporated in different States and are governed by different board of directors.

65.     The aforesaid conspiracy consisted of creating and disseminating false information to government entities to prevent Plaintiffs from being participants in the relevant market.

66.     All Defendants participated and conspired together to publish the false information.

67.     Plaintiffs have been injured in their business and are threatened with further injury as a direct result of Defendants' conduct.

## COUNT IV: CONSPIRACY IN RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C.§ 1 ET SEQ. AND 15 U.S.C. §12 ET SEQ.

68.     Plaintiffs reallege paragraphs 1 through 67 as if fully set-forth herein.

69.     Defendants have conspired with each other to restrain trade in violation of the Sherman Antitrust Act and the Clayton Act.

70.     The aforesaid conspiracy consisted of creating and disseminating false information to government entities to prevent Plaintiffs from being participants in the relevant market(s).

71.     Plaintiffs have been injured in their business and is threatened with further injury as a direct result of Defendants' conduct.

## COUNT V: CIVIL CONSPIRACY

72.     Plaintiffs reallege paragraphs 1 through 71 as if fully set-forth herein.

73.     Defendants knowingly, willfully, wantonly, wickedly, maliciously and malevolently conspired, combined, confederated and agreed together to prevent Plaintiffs from selling helicopter helmets.

74.     Defendants knowingly, willfully, wantonly, wickedly, maliciously and malevolently conspired, combined, confederated and agreed together to prevent Plaintiffs' helmets from gaining approval (or testing and approval) pursuant to the ALSE Handbook or other applicable authority in order to be included on the DOI List.

75.     Additionally, Defendants maliciously conspired to provide false information to Government agencies, civilian agencies such as air medical companies, fire departments, state and local law enforcement, and military contractors, as well as commercial contractors and consumers.

76.     Defendants through fraud and deception have prevented consumers from purchasing Plaintiffs' helmets.

77.     Defendants' have used ill-will, political stature, and influence to deceive Government agencies by providing false information to prevent Plaintiff HHC's product from being approved.

78.     The conspiracy perpetuated against Plaintiffs was done by Defendants to gain financial and economic benefit and to bring about Plaintiffs' financial ruin and unjustly deprive Plaintiffs of their livelihood.

79.     Defendants' motivation, in part, is the innovation and modernization of Plaintiff

HHC's helmet design (HHC's helmets are less costly and do not have the "cracking problem"

widely known to occur with Defendants' helmets), as well as the high level of success Plaintiffs

previously enjoyed in the commercial helicopter helmets market, selling thousands of their

uniquely innovative helmets to civilian and government agencies and contractors in U.S. and

internationally.

80.     Defendants are further motivated by their desire to control the global helicopter

helmets market and prevent Plaintiffs and all other competitors from producing and selling

helicopter helmets.

81.     Until said conspiracy is fully terminated, Plaintiffs' ability to earn a livelihood

through the production, marketing, and sale of their helmets have been significantly and

materially hindered.

82.     As a direct and proximate result of the conspiracy to defame Plaintiffs by and

between Defendants and the actions and statements made by Defendants, in furtherance of

the conspiracy to defame, Plaintiffs have suffered damages.

## COUNT VI: CONSPIRACY TO DEFAME

83.     Plaintiffs reallege paragraphs 1 through 82 as if fully set-forth herein.

84.     Defendants conspired to conduct an ongoing negative sales campaign against

Plaintiffs by falsely advertising to both Government agencies and the civilian market that

Plaintiffs' helmets were counterfeit, unsafe, and unapproved. The three Defendants each had

different roles, and they all unfairly benefitted from the final defamatory products. Defendant

Gentex created false data and information and provided it to Wegge. Wegge used his influence

over GB to cause GB to issue a false and fraudulent White Paper. GB used its contacts with

Federal Personnel to cause them to issue a list of approved helicopter helmets and to cause the false dissemination of an approved list of "helmets" which included only Gentex helmets. All three defendants had a role in creating these acts. Further, in advertisements and trade shows, false information continues to be perpetuated by Defendants.

85.     Moreover, in furtherance of the conspiracy, Defendants conspired to produce a series of papers which were riddled with false and misleading information about helicopter helmets generally, as well as lies designed to promote Gentex helmets and portray the helmets produced by Plaintiffs and other competitors as being dangerous.

86.     Defendants distributed, and continue to distribute these papers and false advertisement in order to defame Plaintiffs and kill off the demand for Plaintiffs' helmets as well as all other market participants.

87.     Additionally, Defendants fraudulently deceived a Government agency providing false information which defamed Plaintiffs in order to cause the federal agency to issue a fraudulent and misleading Safety Alert and to prevent Plaintiff HHC's helmets from gaining approval (or testing and approval) pursuant to the ALSE Handbook or other applicable authority in order to be included on the DOI List.

88.     The conspiracy perpetuated against Plaintiffs was done by all Defendants to gain financial and economic benefits and to bring about Plaintiffs' financial ruin and unjustly deprive Plaintiffs of their livelihood.

89.     Defendants' motivation in part is the advantage Plaintiff, HHC has over Gentex Helmets due to investments, innovation and modernization of Plaintiff HHC's helmet design (HHC's helmets are less costly and do not have the "cracking problem" widely known to occur with Gentex helmets), as well as the high level of success Plaintiff previously enjoyed (prior to

the creation of the scheme in creating a false White Paper) in the relevant market, i.e. selling thousands of its uniquely innovative helmets to civilian and government agencies and contractors in U.S. and internationally.

90.     Defendants are further motivated by their desire to control the global helicopter helmets market and prevent Plaintiffs and all other competitors from producing and selling helicopter helmets.

91.     Until said conspiracy to defame Plaintiffs is fully terminated, Plaintiffs are unable to earn a livelihood through the production, marketing, and sale of their helmets.

92.     As a direct and proximate result of the conspiracy to defame Plaintiffs by and between Defendants and the actions and statements made by Defendants, in furtherance of the conspiracy to defame, Plaintiffs have suffered damages.

## COUNT VII: DEFAMATION

93.     Plaintiffs reallege paragraphs 1 through 92 as if fully set-forth herein.

94.     Defendants have defamed, and continue to defame Plaintiffs by knowingly, intentionally, willfully, or negligently publishing statements about Plaintiffs which they knew or should have known to be false.

95.     Defendants made false statements that are Defamation Per Se, falsely advertising to both Government agencies and the civilian market that Plaintiffs' helmets were counterfeit, unsafe, and unapproved.

96.     Defendants knew that their public statements about Plaintiffs would cause severe damage to Plaintiffs.

97.     As a direct and proximate result of the actions and statements made by Defendants, Plaintiffs have suffered damages.

## COUNT VIII: UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF 6 DEL. C. § 2532

98.     Plaintiffs reallege paragraphs 1 through 97 as if fully set-forth herein.

99.     Defendants' conduct offends established public policy and was immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers as defined by the Act.

100.    Plaintiffs are persons as defined by the Act.

101.    Defendants unlawfully disparaged the goods and business of Plaintiffs by making the false and misleading statements discussed herein. Defendants' unlawful conduct includes, but is not limited to, G&B's submission to the DOI of an image (supplied by Gentex) with a caption stating "Damage to a non-approved helmet from a side impact force". *See* Exhibit E p. 3. This conduct was intended to unlawfully influence expectations of what would happen if a consumer did not wear a Gentex helmet in order to fraudulently boost the sales of G&B and Gentex and damage the reputation of products produced by HHC, GS, and other competitors.

102.    Defendants also violated the Act by, among others, falsely stating that the Gentex SPH-5 has a "Mil Spec" rating even though the SPH-5 has never been designated "Mil Spec" by the U.S. Military. This unlawful conduct causes a likelihood of confusion and/or misunderstanding as to the affiliation, connection, or association, as well as certification, of Gentex's products with the U.S. Military.

103.    Defendants' conduct was, and continues to be, a deceptive act as defined by the Act.

104.    Defendants' conduct was, and continues to be, an unfair practice as defined by the Act.

105.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT IX: UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF 15 U.S.C. § 45

106.     Plaintiffs reallege paragraphs 1 through 105 as if fully set-forth herein.

107.     Defendants' conduct offends established public policy and was immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers as defined by the Act.

108.     Plaintiffs are consumers as defined by the Act.

109.     Defendants' conduct was, and continues to be, a deceptive act as defined by the Act.

110.     Defendants' conduct was, and continues to be, an unfair practice as defined by the Act.

111.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT X - FEDERAL UNFAIR COMPETITION AND FALSE ADVERTISING UNDER 15 U.S.C. §1125(A)

112.     Plaintiffs reallege paragraphs 1 through 111 as if fully set-forth herein.

113.     Defendants' actions as described above and specifically, without limitation, Defendants' pattern of creating and disseminating false information to prevent and hinder Plaintiffs from being able to sell their products to the relevant market, constitutes unfair competition and false advertising in violation of 15 U.S.C. § 1125(a).

114.     Consumers are likely to be misled and deceived by Defendants' representations regarding Plaintiffs' helicopter helmets and helicopter helmet components.

115.     Defendants knew or should have known that their statements were false or likely to mislead.

116.     As an actual and proximate result of Defendants' willful and intentional actions, Plaintiffs have suffered damages in an amount to be determined at trial, and unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm and damage to their business, reputation, and goodwill.

117.     Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to damages for Defendants' Lanham Act violations, an accounting for profits made by Defendants on sales of helicopter helmets and helicopter helmet components, as well as recovery of the costs of this action. Furthermore, Plaintiffs are informed and believes, and on that basis alleges, that Defendants' conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

### COUNT XI: UNJUST ENRICHMENT

118.     Plaintiffs reallege paragraphs 1 through 117 as if fully set-forth herein.

119.     Defendants were, and continue to be, unjustly enriched by their unlawful conduct and statements at the expense and impoverishment of Plaintiffs. Among others, Defendants, through their unlawful conduct and statements obtained increased business, market share, profits and access to government business, including a sole source contract from BLM, at the expense and impoverishment of Plaintiffs' business, market share, and access to government business. The BLM solicitation, for instance, prevented Plaintiffs from soliciting under the contract because the solicitation specifically sought "Gentex SPH5C Helmets." Prior to the specific designation, HHC was engaged to provide over 160 Helicopter Helmets of HHC to the Alaska State Office (Bureau

of Land Management). This restriction is a direct example of how Defendants manipulated the market, monopolized the market, caused "competitive bids" to be uncompetitive, and were unjustly enriched at Plaintiffs expense. See **Exhibit L**.

120.    Defendants enrichment directly caused Plaintiffs to be impoverished. The detailed facts are discussed above.

121.    Defendants have voluntarily accepted and retained the benefit conferred through their unlawful conduct.

122.    The circumstances render Defendants' retention of the benefit is inequitable unless Defendants pay to Plaintiffs the value of the benefit.

## JURY DEMAND

Plaintiffs Demand Trial By Jury on All Applicable Claims.

## PRAYER FOR RELIEF AS TO ALL COUNTS (UNLESS SPECIFICALLY DESIGNATED OTHERWISE)

**WHEREFORE**, Plaintiffs pray that this Court enter judgment against Defendants as follows:

A.  That Defendants be ordered to correct all erroneous impressions persons may have derived concerning the nature, characteristics, or qualities of either Defendants' products or Plaintiffs' products, including without limitation:

1.  The placement of corrective advertising on Defendants' websites informing consumers of their prior misrepresentations regarding Plaintiffs' products;

2.  The removal of all false and misleading press releases and "helpful info" related to Plaintiffs' products from Defendants' websites.

3.  Publish and circulate in private, third-party publications, which distribute to the entire Relevant Market, for a period of four years, correct and truthful information about Plaintiffs' Relevant Product to counteract the four years of false publications.

B.  That Defendants be adjudged to have violated 15 U.S.C. § 1125(a) by unfairly competing against Plaintiffs by using false, deceptive or misleading descriptions or representations of fact that misrepresent the nature, quality and characteristics of Plaintiffs' products;

C.  That Plaintiffs be awarded damages pursuant to 15 U.S.C. § 1117(a), sufficient to compensate it for the damage caused by Defendants' false and misleading statements;

D.  That Plaintiffs be awarded Defendants' profits derived by reason of said acts, or as determined by said accounting;

E.  That such damages and profits be trebled and awarded to Plaintiffs and that Plaintiffs be awarded their costs, attorneys' fees and expenses in this suit under 15 U.S.C. § 1117, as a result of Defendants' willful, intentional, and deliberate acts in violation of the Lanham Act;

F.  Pursuant to 15 U.S.C § 15, an award of the full amount of damages for all such past, present and future injuries caused by Defendants' conduct, including compensatory and other damages, including without limitation, HHCs costs related to its manufacturing plant closure.

G.  An award of punitive damages of at least three-fold of Plaintiffs' actual damages;

H.  An award of injunctive relief including:

    1. Retraction of all false statements;
    2. Notice to all parties who have been misled;
    3. Cease and desist fraudulent actions at trade shows;
    4. Removal of fraudulent content from internet sites including at: http://www.gibson-barnes.com/assets/files/cbp-155841.pdf;
    5. Publication of corrected White Papers;
    6. Enforcement of actions referenced in Exhibit J; and
    7. Execution and service of Plaintiffs' proposed letter.

I.  That Plaintiffs be granted prejudgment and post judgment interest;

J.  That Plaintiffs be granted costs associated with the prosecution of this action;

K.  That Plaintiffs be awarded all their attorney fees;

L.  That Plaintiffs be granted such further relief as the Court may deem just.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:                                By: */s/ John A. Sensing*

Maurice Arcadier                               John A. Sensing (Del. Bar No. 5232)
ARCADIER & ASSOCIATES, P.A.                    Jesse L. Noa (Del. Bar No. 5973)
2815 W. New Haven, Suites 304                  Hercules Plaza, Sixth Floor
Melbourne, FL 32904                            1313 North Market Street
(321) 953-5998 – Telephone                     P.O. Box 951
(321) 953-6075 – Facsimile                     Wilmington, DE  19899-0951
office@wamalaw.com                             (302) 984-6000 – Telephone
                                               (302) 658-1192 – Facsimile
                                               jsensing@potteranderson.com
                                               jnoa@potteranderson.com
Dated:  July 31, 2017
5325961                                        *Attorneys for Plaintiffs*